JOHN M. WILLIAMS *vs.* COMMERCIAL TRUST COMPANY.

Hampden. May 21, 22, 1931. — September 10, 1931.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, & WAIT, JJ.

*Frauds, Statute of. Trust,* Resulting. *Contract,* Of indemnity. *Agency,* Indemnification of agent by principal. *Trust Company.*

In a suit in equity begun in 1928 against a trust company seeking cancellation and discharge of certain notes and mortgages, it appeared that the defendant in May, 1922, was desirous of having the use of certain real estate adjoining property where it conducted its bank, that its president, in order to conceal the purchase of the property from the commissioner of banks, solicited the plaintiff to take title to the property in his name, the plaintiff to be "properly protected" in the premises, and that the president's action was known to and ratified at a meeting of the board of directors of the defendant at which a majority of the directors were present, the plaintiff "to have protection, moral at least, because the bank couldn't give him any definite legal instrument on it, on account of the bank commissioner." The property was worth $165,000. The capital stock of the defendant paid in and issued was $350,000, and its surplus was $105,000. Thereupon the plaintiff took the title to the property, subject to a first mortgage, gave his note for $12,000 secured by a second mortgage; gave his note running to the defendant's attorney for $22,000 secured by a third mortgage and by a fourth note for $22,000; and gave a further note for $4,000; at the time the suit was brought, $6,000 of principal still was due on the $12,000 second mortgage note, which was held by a third person, and the two $22,000 notes and the $4,000 note were held by the defendant and the second and third mortgages were outstanding. The defendant had opened a bank account in the name of the plaintiff as trustee, paying into it the proceeds of the $4,000 note and receipts from the land; all the funds in such account were used for the defendant's purposes in connection with the real estate, and, of one hundred fifty-three checks drawn thereon, only one was signed by the plaintiff, the others being signed by officers of the defendant or paid by it without signature. Before bringing suit, the plaintiff tendered a deed of the premises to the defendant. A final decree was entered ordering the defendant to cancel the two $22,000 notes, the $4,000 note and the third mortgage, and to cause the second mortgage note to be discharged or to pay the plaintiff the amount still due thereon. The defendant appealed. *Held,* that

(1) Because of the defendant's promise to protect the plaintiff from liability on the second mortgage note, and the fact that it was

the real purchaser of the property, that transaction must be considered as a loan from the plaintiff to the defendant;

(2) The circumstances gave rise to a resulting trust of the land for the benefit of the defendant and the statute of frauds was not a defence;

(3) Although the property was encumbered and was worth more than twenty-five per cent of the capital actually paid in and surplus account of the defendant, the provisions of G. L. c. 172, § 41, were not a defence to the suit: whether the defendant, as against the Commonwealth, could hold legal title to the property purchased with its money was not the issue;

(4) The plaintiff should be indemnified, and the final decree was proper.

BILL IN EQUITY, filed in the Superior Court on July 3, 1928, and afterwards amended, seeking cancellation of certain notes and the discharge of certain mortgages in the circumstances stated in the opinion.

The suit was referred to a master. Among material conclusions of the master were the following:

"Before bringing this action, the complainant tendered a deed of the property to both the bank and the corporation. Each refused to accept the tender.

"In the taking of the title to the property at 1666 and 1668 Main Street, in the executing of the notes, mortgages, checks and papers, that he signed, and in the opening of the trustee account in the bank, and in all that he did in connection with these transactions, the plaintiff acted for the bank and never for himself. He never understood that he was the beneficial owner of the property with the right to sell, mortgage, or do as he wished with it as owner. And I find as a fact, upon the facts that are found herein and those are all the facts, that he never was the beneficial owner. All that he did, he did relying upon the oral promise of Mr. Skinner that the bank would protect him for all liability. That promise was reported by Mr. Skinner to the directors of the bank. Upon the facts herein found, I draw the further inference of fact and find, insofar as it is a finding of fact, that the directors ratified that promise. The plaintiff in good faith did all the things requested of him. The bank has had whatever benefit accrued from the plaintiff's acts; title to the property adjoining the bank was

placed in hands friendly to it; the bank had the management of the property in its own hands; it was available for the expansion of the bank's quarters; whatever profit or loss resulted from the operation of the building was the profit or loss of the bank. Upon the facts herein found, I find, so far as it is a question of fact, that the plaintiff is entitled to be indemnified and saved harmless by the bank from any and all liability on account of his having signed the $22,000 demand note to the bank, the $22,000 mortgage note to Mr. Small, the $4,000 demand note to the bank, and the $12,000 mortgage note to William Sacks.

"The last named note has been assigned to Frank B. Mason and $6,000 has been paid on the principal thereof; the other three notes are now held by the bank."

Other material facts found by the master are stated in the opinion.

The suit was heard by *Broadhurst*, J., upon the master's report and exceptions by the defendant thereto, an interlocutory decree was entered, sustaining an exception to that portion of the report above quoted beginning "Upon the facts here found, I find," and ending "$12,000 mortgage note to William Sacks," on the grounds that the finding was a ruling of law and was not within the province of the master; and overruling all other exceptions to and confirming the report except in the particular above stated. The final decree described in the opinion then was entered. The defendant appealed from both decrees.

*C. W. Bosworth*, for the defendant.

*E. O. Proctor*, for the plaintiff.

PIERCE, J.    This is an appeal by the defendant Commercial Trust Company from an interlocutory decree in the Superior Court confirming the master's report except as modified in said decree, sustaining the plaintiff's first objection to the master's report, overruling the objections of the defendant trust company other than subdivisions "j" and "k" of its ninth objection, and allowing the motion of the plaintiff, filed October 18, 1929, to amend his bill of complaint. It is also an appeal from a final decree in the same case ordering the defendant trust company to

cancel and deliver up three promissory notes, two for $22,000 each, dated respectively May 29 and May 31, 1922, and one for $4,000, dated December 31, 1923, together with a third mortgage deed securing one of the $22,000 notes; decreeing that there is due Frank B. Mason upon a note of $12,000 dated May 29, 1922, ($6,000 of the principal having been paid), including interest to the date of the decree, $6,797, and commanding and enjoining the trust company within thirty days of the entry of the decree to pay and discharge said note and to cause the same, together with the second mortgage from the plaintiff to one Sacks now held by said Mason on the real estate aforesaid, to be cancelled and delivered up to the plaintiff, or in the alternative to pay to the plaintiff $6,000 and interest thereon at the rate of six per cent per annum from June 1, 1928, to the date of payment, and, in default of such payment either to the present holder of said mortgage or to the plaintiff, execution is to issue for said sum of $6,000 with interest thereon at the rate and from the date aforesaid; and enjoining the trust company from enforcing the payment of the three notes first mentioned.

By way of counter claim the trust company in its answer sought affirmative relief for the payment of the money which, it alleged, it had lent to the plaintiff and which was represented by the three notes described in the plaintiff's bill of complaint, one of said $22,000 notes having been given as collateral for the other $22,000 note. On the defendant's counter claim the master found in so far as questions of fact were presented that (1) "The notes and each of them above referred to were given for full value"; (2) "There was no want or failure of consideration for any of them"; (3) "The $22,000 mortgage note was given as collateral for the $22,000 Bank note"; (4) "There is due the Bank, unless as a matter of law on the facts in this report, barred by the statute of limitations or subject to other defences, $22,000 plus interest at six per cent from January 1, 1924, amounting, to the date of the bill, to $27,943.67; and $4,000 plus interest at six per cent from December 31, 1923, amounting, to the date of the bill, to $5,081.33; a

total of $33,025"; (5) "There is due Frank B. Mason, $6,000 plus interest at six per cent from the date to which interest has been paid, and what that date is doesn't appear."

In his bill of complaint and brief the plaintiff, as against the trust company, seeks exoneration, protection and indemnity from the above described alleged obligations, both by virtue of the trust company's express promise and through the principle of the law of agency to the effect that an agent is entitled to indemnity from his principal for liabilities incurred by the agent in carrying into effect an act which the employer appears to have a right to authorize him to do, and which would be lawful if the employer had the authority he pretends to have; and if he is barred from relief upon both of these grounds, he contends that he is entitled to the same relief upon the basis of an implied contract of the trust company to return, or to compensate him for, benefits received by the trust company at the plaintiff's expense. At the trial by agreement of parties the original bill of complaint was dismissed as to the Commercial Trust Corporation.

In addition to denials of charges in the bill of complaint, the answer of the defendant trust company (hereinafter called the defendant) sets up that the promises of the defendant, if proved, constituted agreements or contracts within the statute of frauds, G. L. c. 259, § 1, or within G. L. c. 203, § 1, and that in neither situation was the contract in writing, as such agreements are required to be. The defendant further answering says "that if this defendant ever made any promise to indemnify or protect or to save harmless the plaintiff or to guarantee him against loss as alleged in the complaint, which the defendant denies, the same was *ultra vires* of this defendant Trust Company and void." The answer of the plaintiff to the set-off or counter claim of the defendant, as stated in paragraph 14 of its answer and in its prayers for relief, sets up (1) that the defendant does not come into court with clean hands; (2) laches; and (3) the statute of limitations (G. L. c. 260, § 2,) with reference to the demand notes for $22,000, dated respectively May 31, 1922, and May 29, 1922. The

defendant in its brief considers at large all questions saved by its appeals, and gives no detailed treatment of the various objections to the master's report and of the other matters raised by its appeals.   The evidence is not reported.   It follows that the findings of the master on questions of fact are to be taken as true in so far as they are consistent with each other and not inconsistent with the admitted charges of the bill of complaint.

A succinct yet adequate statement of the pertinent facts is as follows:   In May, 1922, the defendant was engaged in a general banking business at Springfield, Massachusetts, under the provisions of St. 1904, c. 374.   Its executive officers were a president, Arthur J. Skinner, a vice-president, and a board of twelve directors.   For the conduct of its business it leased a portion of a building owned by the Commercial Trust Corporation, a corporation organized in 1919 by the defendant to hold property which the defendant could not by statute hold.   Prior to May, 1922, the board of directors of the defendant had under discussion the desirability of the purchase of property adjoining the property in use by the defendant.   Under G. L. c. 172, § 41, the defendant was unable to take title to the property.   The plan under discussion contemplated the erection of a building to occupy the site owned by the corporation and the adjoining site.   On May 9, 1922, at a meeting of the board of directors of the defendant, it was suggested that the president, Skinner, see one Chapin relative to taking over the adjoining property and "carrying it until the Bank could get its financial structure arranged."   The plaintiff was secretary of the company of which Chapin was president.   When Skinner called to see Chapin the plaintiff told him that Chapin was absent, and inquired whether there was anything he could do for him.   Skinner replied that the defendant wanted to acquire the property at 1666–1668 Main Street and that he came to see if Chapin or Fuller (its vice-president) would not act in the capacity of a sort of go-between man to take the property over and carry it temporarily in his name for the defendant, and as soon as the financing was completed and the defendant

could adjust the matter turn it back. He said he did not want it known that the defendant was after the property. To this, and to the further statement of Skinner that ". . . you will do just as well," the plaintiff said he would be glad to help in any way he could if he incurred no liability and was fully protected. Skinner replied that the defendant would protect him and that he, Skinner, would have the necessary papers prepared. The plaintiff told him that that was satisfactory to him and to go ahead; he would be glad to help him out. At the next meeting of the board of directors of the defendant, held on May 16, 1922, Skinner reported his interview with the plaintiff saying "that he saw John Williams who had said he would take on the property for the bank as a straw man with himself properly protected; that he was particularly fortunate in getting Williams because there was another John Williams in town who most people would think was doing the buying and they would not connect it up with the bank." The members of the board present, who constituted a majority of the board, said "they were satisfied and that Williams was to have protection, moral at least, because the bank couldn't give him any definite legal instrument on it, on account of the bank commissioner." It was distinctly understood that the plaintiff was to be protected.

The directors told Skinner to arrange with one Wooden, who was at that time general counsel for the defendant, to look after the legal side of it. Thereupon, Skinner took up the matter with Wooden and, in Wooden's absence, with his partner, one Harold P. Small. On May 22, 1922, Small, acting on information and instructions given him by Skinner, prepared an agreement of purchase and sale by the terms of which one William Sacks was to sell and the plaintiff was to buy the property 1666–1668 Main Street, on or before June 1, 1922, for $165,000, of which $1,000 was to be paid down, $14,000 was to be paid in cash upon delivery of the deed, and the remainder by Williams's note dated June 1, 1922, payable in annual instalments of $1,000

each, with interest, for ten years, the balance of the note on demand thereafter, the premises to be conveyed subject to a mortgage of $130,000 held by one George G. Dunn. On May 22, 1922, the plaintiff, at Small's office, signed an agreement with William Sacks, the owner, for the purchase and sale of the land in question. On his way to Small's office, at the request of Skinner, the plaintiff had stopped at the bank and drawn a check for $1,000 to the order of William Sacks. This check was left at the bank. It was drawn on the plaintiff's account at the bank and was certified by the defendant, although on that day he had a balance of only $421.31 in his account. The plaintiff also signed a paper, prepared by the defendant's attorney, reading as follows: "May 22, 1922. KNOW ALL MEN BY THESE PRESENTS, that I, John M. Williams of Springfield, Massachusetts, have this day agreed to purchase from William Sacks of said Springfield, real estate located on the westerly side of Main Street situated between William Fox Amusement Company and the Commercial Trust Company, do hereby declare that I am acting as agent for the said Commercial Trust Company in this matter and have signed the agreement of sale for their benefit and that I personally have no other interest in the aforesaid property." This paper Small delivered to the defendant. On May 23, 1922, a change in the price and terms of the transaction having been arranged, Skinner, as president of the defendant, wrote Small a letter stating the new terms and referring to the property as "this property that we are purchasing indirectly." Sacks signed a deed of the property to the plaintiff, dated May 29, 1922, subject to a first mortgage of $130,000, which he acknowledged on May 31, 1922.

On May 29, 1922, the plaintiff signed a second mortgage and a mortgage note for $12,000, and also signed a third mortgage and mortgage note running to Harold P. Small for $22,000. All these papers were left with Small. At the time of signing the papers the plaintiff asked Small about his guarantee, and was told that Wooden had really handled

the details of the case; that he was out of town, but on his return it would be attended to; that whatever they had promised they would deliver, and on this statement the plaintiff signed the papers.

The circumstances under which the notes that are the subject matter of this suit were uttered and the proceeds used can be shortly stated as follows: When the property was deeded from Sacks to the plaintiff the latter gave his note for $22,000 to the defendant, secured by a second note for a like amount and a third mortgage on the property made to Small, attorney for the defendant. The defendant opened an account in the name of "J. M. Williams, Trustee," in which was deposited the sum of $22,000 and all receipts from the building. On this account the plaintiff drew a check for $1,000 payable to Sacks and a check for $21,000 payable to "Wooden & Small." These acts were all done at the instance of Skinner as president of the defendant, who held a power of attorney from the plaintiff to draw upon the account. Upon all the facts found by the master it cannot be doubted that these notes were not given for real loans to the plaintiff, but were given only to conceal the purchase of the property from the commissioner of banks; and it is plain that the defendant never intended to collect the notes and that the plaintiff never expected to be called upon to pay them. The plaintiff, again at the request of the defendant, gave a note for $12,000 to Sacks, secured by a second mortgage on the property, as a part of the purchase price. Because of the defendant's promise to protect him from liability on this note, and the fact that it was the real purchaser of the property, this transaction must be considered as a loan from the plaintiff to the defendant. There remains unpaid on this note the sum of $6,000 and interest. On December 31, 1923, the plaintiff, at the request of said Skinner, gave the defendant his note for $4,000. The proceeds of this note were credited to the plaintiff's personal account, and against that fund he drew and deposited his personal check for $4,000, payable to the J. M. Williams, trustee, account. The master found

that this trustee's account actually belonged to the defendant, and was an account of receipts and disbursements in the management of the purchased building.  Until January, 1924, the details of the account were handled by Frank N. Hughes, the treasurer of the defendant.  There were drawn in this account from July 1, 1922, to January 12, 1924, one hundred fifty-three checks.  Of these, one was signed by the plaintiff: "check, number 25, dated September 20, 1922, to the order of George G. Dunn, for $1,574.45, in payment of mortgage interest on 1666–1668 Main Street"; one was signed by Frank H. Hughes: "number 47, dated January 9, 1923, to the order of C. A. Frazer, Coll, for $13.25"; fifty-four were signed A. J. Skinner, attorney; and ninety-seven were unsigned but were paid by the defendant.  In addition to the $4,000 deposit mentioned, credits to this account consisted of money received from tenants of the building or from insurance.

The defendant in its answer pleaded the statute of frauds.  G. L. c. 259, § 1, Fourth; G. L. c. 203, § 1.  It is clear that the defendant signed no memorandum sufficient to satisfy the statutes.  The letter written by Skinner, as president, to his attorney is defective in that it does not describe the property, *Whelan* v. *Sullivan,* 102 Mass. 204, *Bradley* v. *Haven,* 208 Mass. 300; and does not show who is the vendor, *McGovern* v. *Hern,* 153 Mass. 308, *Lewis* v. *Wood,* 153 Mass. 321, *Des Brisay* v. *Foss,* 264 Mass. 102. Notwithstanding the fact that these statutes are irrelevant, it appears by the master's report that the purchase was entirely financed by the defendant, that expenditures for the acquisition and maintenance of the property were all made from money belonging or credit lent to the defendant.  Such a situation gives rise to a resulting trust. *Livermore* v. *Aldrich,* 5 Cush. 431.  *Blodgett* v. *Hildreth,* 103 Mass. 484.  *Davis* v. *Downer,* 210 Mass. 573.  *Brady* v. *Brady,* 238 Mass. 302.  A trust by operation of law arises when land is paid for by one person and the legal title to it is taken by another.  This is because of the presumed intention of the parties that the purchase was to be made for

the benefit of the one who paid.  Moreover, the plaintiff tendered a deed.  See *Holian* v. *Holian,* 265 Mass. 563.

The defendant also pleaded as an affirmative defence G. L. c. 172, § 41.  This statute reads, in part: "Such corporation (a trust company) may hold real estate unencumbered by mortgage suitable for the transaction of its business to an amount including the cost of alterations and additions in the nature of permanent fixtures, not exceeding twenty-five per cent of its capital actually paid in and its surplus account."  At the time of the transaction in question the capital stock of the defendant actually paid in and issued was $350,000, its surplus $105,000.  At that time, therefore, the amount of the real estate which the defendant was authorized to hold under the statute was $113,750 unencumbered by mortgage.  The property which it wanted to purchase, and which was purchased by the plaintiff for it, was encumbered and had a valuation of $165,000.  These circumstances and the above quoted statute do not afford the defendant a defence as against this plaintiff.  There is no doubt that the defendant owned the equitable title to the property purchased, although the legal title was in the plaintiff.  Whether the defendant, as against the Commonwealth, could hold legal title to the property purchased with its money is not the issue here.

The question presented is, Must the defendant fulfill its promise to indemnify the plaintiff?  See *Vigeant* v. *Jeanne D'Arc Credit Union,* 271 Mass. 479.  Upon this promise the plaintiff lent his credit when he made the second mortgage note, of which $6,000 is unpaid.  The defendant could borrow credit in that way.  The plaintiff should be indemnified.  Upon this promise he made two notes for $22,000, and one note for $4,000, all of which are now in the hands of the defendant.  The agreement to protect the plaintiff required the defendant to cancel these notes. In passing it may be noted that the statute above quoted was amended by St. 1922, c. 321, approved April 18, 1922, and that since the amendment became effective on July 18, 1922, there remains no inhibition against a trust company holding encumbered real estate.

In view of the conclusion reached, it is unnecessary to discuss the several exceptions of the defendant or the merits of the cross action.

The entry must be

*Interlocutory and final decrees affirmed.*